# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DEBORAH HERRON,

                    Plaintiff,

          v.                              Case No. 14-CV-56

CAROLYN COLVIN,
**Acting Commissioner of**
**Social Security,**

                    Defendant.

## DECISION

Plaintiff Deborah Herron suffers from back pain, obesity, and depression and as a result alleges that she is disabled. On April 4, 2011, she applied for Disability Insurance Benefits and Supplemental Security Income and alleged an onset date of March 14, 2011. Her application was denied initially and upon reconsideration. An administrative law judge (ALJ) likewise concluded after a full hearing that Herron was not disabled. The Appeals Council denied review, and Herron filed the present action in this court seeking a direct award of benefits or, in the alternative, remand pursuant to sentence 4 of 42 U.S.C. § 405(g). Because the Appeals Council denied review, the ALJ's decision is the final decision of the Commissioner. *Moore v. Colvin,* 743 F.3d 1118, 1120

(7th Cir. 2014). In accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b) the parties have all consented to the full jurisdiction of a magistrate judge. (ECF Nos. 20, 21.)

## BACKGROUND

### A.    Facts

Herron is 49 years old. (Tr. 68.) She was employed as a certified nursing assistant (CNA) from 1989 until March 14, 2011. (Tr. 72.) In 1986, as she was lifting a patient, the patient fell and Herron tried to break the patient's fall. (Tr. 442.) Ever since then, she says, she has experienced lower back pain. (Tr. 37, 442.)  In 2005 she had surgery on her spine in an effort to relieve the lower back pain. (Tr. 314, 406, 546.) Although the surgery initially eased her pain, the pain returned and progressively worsened. (Tr. 559-60.)

In May 2010, a computerized tomography scan (commonly known as a "CT Scan") revealed that Herron had "degenerative disc disease and facet arthropathy with moderate bilateral neural foraminal narrowing"—meaning that part of her spine was wearing down and compressing. (Tr. 564.) Herron testified that due to her back pain she initially reduced her hours working as a CNA and in March 2011 stopped working altogether. (Tr. 89, 91.) Treatments for the pain included injecting steroids, ingesting prescriptions, and affixing devices that emit radio waves and electric currents. (Tr. 73, 422, 458, 887-88.)  All of these, Herron testified, were to little avail. (Tr. 74-75.)

Herron reports that, as a result of the pain, she gets no more than two or three hours of sleep at night. (Tr. 239, 423.) The lack of sleep has led to chronic fatigue (Tr. 423), which results in her taking a two-hour nap during the day (Tr. 246). Beyond taking naps due to fatigue, Herron has to lay down three to four hours a day in order to take the pressure off of her back. (Tr. 78.) She can only walk about half-a-block before she needs to stop and rest. (Tr. 243, 408.)

In addition, the chronic back pain has caused her to suffer bouts of depression. (Tr. 80, 246.) In early 2011 a mental status exam led to a diagnosis of adjustment disorder and depression. (Tr. 556.) For the next several months she reported difficulty with attention, concentration, and social interaction. (Tr. 545-55.) In October 2011 she was diagnosed with depression associated with the chronic pain. (Tr. 777.) In 2012, although medication and therapy mitigated Herron's depression and anxiety, she still fluctuated between mild and moderate depression. (Tr. 758-59, 773.) The medication that she takes for her back pain and depression causes drowsiness, dizziness, and impairs her ability to concentrate and pay attention. (Tr. 246, 281, 554.)

Beyond her back pain, Herron also experiences urinary problems. Herron had surgery in 2008 to implant an InterStim device (bladder neurostimulator) on her bladder. (Tr. 696.) Subsequent treatment notes indicate Herron's bladder device, like her back surgery, provided only fleeting relief. (Tr. 696, 707-08.)

In addition, Herron says that she suffers from upper extremity pain. Herron's treating physician noted that Herron had trouble performing fine finger movements as a result of the upper extremity pain. (Tr. 933-34, 937.) Herron testified that due to numbness and tingling in her fingers she has trouble "picking up and grasping and holding things." (Tr. 99, 448-49, 451, 460.)

Herron says that she also suffers from migraine headaches. She testified that she experiences about four migraine headaches a month, each of which lasts about seven or eight hours. (Tr. 79.) She testified that the migraines are often accompanied by nausea, dizziness, and vomiting. (Tr. 91.) A journal that Herron prepared to record her migraines indicates that from between October and December 2012 Herron experienced migraine pain ranging from mild to severe, often resulting in her having to lie down until the migraine passed. (Tr. 288-91.)

Many of the above ailments were aggravated by Herron's obesity. (Tr. 464, 711.)

Herron's primary care physician, Dr. Joan Bedinghaus, opined that Herron can sit and stand/walk less than two hours per day in an eight hour workday with normal breaks, generally would have trouble moving her fingers, and would have difficulty concentrating. (Tr. 507-10, 933-34.) She also opined that Herron can never bend. (Tr. 509). As a result of Herron's various impairments, Dr. Bedinghaus estimated that Herron would experience more than four "bad" days a month that would require her to be absent from work. (Tr. 510.)

Herron's treating psychologist, Dr. Mary Taylor, concluded in a mental impairment assessment form that Herron's chronic fatigue due to her medications and disturbed sleep would result in Herron being absent from work more than four days per month. (Tr. 515-18.) She also opined that Herron could not consistently complete a normal workday due to fatigue. (Tr. 515.)

Herron's treating psychiatrist, Dr. J. Burgarino, concluded in a medical source statement form that, among other difficulties, Herron could not work a full-time schedule and would miss work more than four days per month. (Tr. 948.) He also concluded that Herron would need unscheduled breaks at least six times a day; that she would need extra supervision to start or complete tasks at least once a day; and that she would have difficulty performing fast-paced tasks accurately, being punctual, making simple work-related decisions and carrying out detailed tasks. (Tr. 947-50.)

## B. ALJ's Decision

In determining whether a person is disabled, an ALJ applies a five-step sequential evaluation process. At step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Here, the ALJ found that Herron was not so engaged, and so the analysis proceeded to the second step, which is a consideration of whether the claimant has a medically determinable impairment, or combination of impairments, that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c).

"In order for an impairment to be considered severe at this step of the process, the impairment must significantly limit an individual's ability to perform basic work activities." *Moore*, 743 F.3d at 1121. If the evidence indicates that an impairment is a slight abnormality that has no more than a minimal effect on an individual's ability to work, then it is not considered severe for step two purposes. *Id.* Here, the ALJ concluded that Herron had the following severe impairments: low back disorder; weight disproportionate to height; and major depression. (Tr. 12.) The ALJ concluded that those impairments imposed more than minimal limitations on Herron's ability to perform basic work activities. (*Id.*) The ALJ further concluded that certain other impairments were not severe. (Tr. 13.) Specifically, he found that her neurogenic bladder and history of headaches do not cause more than a minimal limitation in Herron's ability to perform basic work activities. (*Id.*)

At step three, the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926) (called "the listings"). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria set forth in a listing and also meets the duration requirement (20 C.F.R. §§ 404.1509, 416.909), the claimant is disabled. If the claimant's impairment or combination of impairments is not of a severity to meet or medically

equal the criteria set forth in a listing, the analysis proceeds to the next step. Here, the ALJ found that Herron does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments, and Herron does not challenge that finding. (Tr. 13-14.)

In between steps three and four, the ALJ must determine the claimant's residual functional capacity (RFC), which is the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from her impairments. *Moore*, 743 F.3d at 1121. In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1520(d), 404.1545, 416.920(e), 416.945. The RFC determination is a "function-by-function" assessment of the claimant's maximum work capability. *Elder v. Astrue*, 529 F.3d 408, 412 (7th Cir. 2008).

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The term "past relevant work" means work performed within the last fifteen years or fifteen years prior to the disability's onset. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant has the RFC to do her past relevant work, she is not disabled.

At the last step of the evaluation process, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work

experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). If she is able to do other work, she is not

disabled. 20 C.F.R. §§ 404.1560(b)(3), 416.960(b)(3). If she is not able to do other work

and meets the duration requirement, she is disabled. 20 C.F.R. §§ 404.1520(g),

416.920(g). In order to support a finding that a claimant is not disabled at this final step,

the Social Security Administration is responsible for providing evidence that

demonstrates that other work exists in significant numbers in the national economy that

the claimant can do, given her RFC, age, education, and work experience. 20 C.F.R.

§§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c).

> The ALJ concluded that Herron has the RFC
>
> to perform light work as defined in 20 C.F.R. §§404.1567(b) and 416.967(b)
> except she can only occasionally climb ramps or stairs, balance, stoop,
> kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds and she
> must avoid unprotected heights and dangerous moving machinery; she is
> able to perform simple, routine, repetitive tasks requiring few changes in a
> routine work setting.

(Tr. 14.) To support his RFC determination, the ALJ relied upon the testimony of two

state agency consultants. (Tr. 18.) Most significantly, he concluded that the testimony of

Dr. Craig Childs—a state agency psychiatric consultant who opined that Herron had

only "some moderate limitations in maintaining attention, concentration and dealing

with change and stress in the work place"—was consistent with the evidence as a whole

and was entitled to "great weight." (Tr. 18, 667.) In addition, he gave "partial weight" to

the testimony of state medical consultant Mina Khorshidi, who opined that Herron was

capable of work at the light exertional level except that she could only occasionally stoop. (Tr. 18.)

Although the ALJ concluded at step four that Herron is unable to perform any past relevant work, he concluded at step five that, considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Herron can perform, relying on the testimony of a vocational expert. (Tr. 20.) Specifically, the vocational expert testified that, given the above considerations, there are 7,800 housekeeper positions, 4,300 waiter/waitress positions, and 1,300 dining room attendant positions in the state of Wisconsin that Herron could perform. (Tr. 103-04.)

In reaching that conclusion, the ALJ found that Herron's complaints regarding the intensity, persistence, and limiting effects of her pain and depression were not fully credible. (Tr. 15.) With regard to her allegations of pain, he found that there was no medical evidence that Herron's condition worsened after her 2005 back surgery and that she continued to be engaged in substantial gainful activity thereafter until the alleged onset of her disability. (Tr. 18.) He pointed out that her treatment providers recommended increased exercise to improve her pain management—a recommendation he concluded was inconsistent with a claim of disability and with the level of pain alleged by Herron. (Tr. 18-19.) With regard to Herron's allegations of depression, the ALJ principally relied upon a September 2012 examination that revealed no signs of

thought disorder, psychosis, or mental disease, and which also reported that her agitation, confusion, and anxiety were all under good control. (Tr. 19.) Thus, while he acknowledged that she "does experience some limitations," he concluded that they were "not to the extent alleged." (*Id.*)

The ALJ acknowledged that the assessments of Drs. Bedinghaus, Taylor, and Burgarino indicate that Herron is unable to work. (Tr. 17-18.) However, he concluded that Drs. Bedinghaus and Taylor offered medical opinions that were unsupported by each of their respective treatment notes and that Dr. Burgarino offered opinions that were inconsistent with the overall record and not supported by ongoing psychological examinations. (*Id.*) Thus, he afforded "little weight" to their opinions. (Tr. 17-18.)

The ALJ's determination of Herron's RFC, and his conclusion at step five that Herron could perform jobs that exist in significant numbers in the national economy, are the focus of Herron's challenge to the ALJ's decision.

## ANALYSIS

The administrative law judge's decision will typically be remanded for one of two reasons: either it was not supported by substantial evidence, or it contained a legal error. *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997). First, the ALJ's decision is to be upheld if it is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore*, 743 F.3d at 1120. It need not be a preponderance of the evidence, but it must be more than a mere

scintilla. *Schmidt v. Astrue*, 496 F.3d 833, 841-42 (7th Cir. 2007) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). Although this court is not to reweigh the evidence or substitute its own judgment for that of the ALJ, it is to examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow this court to assess the validity of the ALJ's ultimate findings and afford Herron meaningful judicial review. *Moore*, 743 F.3d at 1121.

The second reason for remand is that the ALJ's decision contains a legal error, such as applying the wrong standards. The Social Security Administration "has promulgated an intricate and complex set of regulations and rulings that are intended to guide the ALJs in analyzing disability claims." *Klahn v. Colvin*, 13-C-165, 2014 WL 841523, *5 (E.D. Wis. Mar. 4, 2014). An ALJ's legal conclusions are not afforded deference. *See Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1094-95 (E.D. Wis. 2001). Decisions that stray from the rule and regulations, absent harmless error, will be remanded. *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003).

### A.  ALJ's Credibility Determination

A person cannot be found disabled based solely upon the claimant's own testimony as to his or her symptoms. SSR 96-7p. Rather, there must be a medically determinable physical or mental impairment that could be reasonably expected to produce the claimant's symptoms. *Id.* If there is such an impairment, the ALJ will then have to determine the severity of the resulting symptoms. *Id.* However, because

symptoms like pain, fatigue, shortness of breath, weakness, and nervousness often cannot be assessed objectively, it is frequently necessary to assess the claimant's credibility to determine the severity of symptoms. *Id.*

An assessment of the claimant's credibility requires an assessment of the entire case record. SSR 96-7P. Evidence that is frequently relevant to this analysis includes

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptom; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess claimants. *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). An ALJ's credibility determination will not be upset unless it is "patently wrong," *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013), or "divorced from the facts contained in the record." *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). The ALJ must explain his decision in such a way that allows a reviewing court to determine whether he reached his decision in a rational manner, logically based on his specific findings and the evidence in the record. *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011).

The ALJ found that Herron's impairments could cause her symptoms, but "the claimant's statements concerning the intensity, persistence and limiting effects of these

symptoms are not entirely credible for the reasons explained in this decision." (Tr. 15.) That statement is largely the same as the oft-criticized credibility boilerplate that frequently appears in social security decisions. *See, e.g., Moore v. Colvin*, 743 F.3d 1118, 1122 (7th Cir. 2014) (citing cases criticizing similar conclusory boilerplate credibility findings). Not only is the court left to wonder why the ALJ found Herron to not be *entirely* credible, but it is also left to wonder to what extent he found her to be even *partially* credible.

In an effort to defend the ALJ's credibility finding, the Commissioner highlights the fact that the ALJ noted certain medical evidence that indicated Herron had improved. (ECF No. 18 at 17-19.) However, the ALJ never connected this recitation of Herron's medical history to his credibility finding. Rather, the portions of the ALJ's decision upon which the Commissioner now relies came amidst a fairly general and objective recounting of the medical evidence in the record, thus containing facts that both supported and undermined Herron's claim of disability. (*See* Tr. 15-17.) Although a claimant's treatment history may be appropriately considered in assessing the claimant's credibility, *see* 20 C.F.R. § 404.1529(c)(3)(v), SSR 96-7p, such an assessment must be made by the ALJ and not merely by the Commissioner in an effort to support the ALJ's conclusion.

The statements of the ALJ upon which the Commissioner relies lack the specificity necessary to permit adequate review. *Golembiewski v. Barnhart*, 322 F.3d 912,

916 (7th Cir. 2003). Moreover, the Commissioner's attempt to take isolated statements from the ALJ's decision and cobble them together to make an argument the ALJ never made is an impermissible post hoc argument. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). If this sort of practice was permissible, it would obliterate the *Chenery* rule. An ALJ's decision could be little more than a comprehensive summary of the evidence, with the Commissioner on appeal filling in the gaps in reasoning.

The court finds that the ALJ's explanation as to why he found Herron not entirely credible is not supported by the record. For starters, the ALJ's statement that there is no medical evidence that Herron's condition worsened after her lumbar fusion in 2005 is not correct. Medical records from after 2005 depict Herron's condition as deteriorating over time, with records from shortly before her alleged onset indicating that Herron suffering from significantly increased pain that was aggravated by her work. (*See, e.g.*, Tr. 452-58.)

And while it is correct that medical professionals encouraged Herron to exercise (*see, e.g.*, Tr. 323, 445, 454, 711, 887), it is not clear why the ALJ apparently believed this recommendation to be inconsistent with the severity of symptoms that Herron reported, much less how the recommendation to exercise might somehow suggest that Herron is capable of fulltime work. The recommendations were for relatively sedentary exercises such as "[g]entle stretching exercises," (Tr. 471, 695), or "exercise in a gentle and

gradual fashion," (Tr. 817). More importantly, Herron reported that she attempted to exercise yet she was generally prevented from doing so because of her pain. (Tr. 408, 410, 423-24, 446, 448, 458, 460, 464, 702, 719, 745; *but see* Tr. 456-57 (noting "no increased complaints of pain with exercise").)

As for the ALJ's assessment of Herron's mental impairments, the fact that her symptoms improved or that certain impairments were under good control do not, without more, support a finding that Herron is capable of full-time work or that her statements regarding the severity of her symptoms are not credible. A person's symptoms might improve from severe to moderate and yet still be disabling. Improvement alone does not suggest the absence of a disability. Similarly, symptoms may be disabling and yet accurately characterized as being under control.

Therefore, it is the conclusion of the court that the ALJ failed to adequately explain and support his conclusion that Herron's reported symptoms were not wholly credible. Failure to undertake the analysis required under SSR 96-7p constituted an error of law for which remand is necessary.

**B.    Medical Opinions**

Herron contends that the ALJ applied an incorrect legal standard when assessing the opinions of her three treating physicians. She also contends that the ALJ failed to properly evaluate each of her three treating sources' assessments of her impairments,

which assessments Herron claims are supported by evidence in the record. (ECF No. at 4-11.)

The opinion of a treating source is entitled to controlling weight regarding the nature and severity of an impairment, provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. But even if the opinion of a treating source is not entitled to controlling weight, the opinion is nonetheless entitled to deference and must be weighed utilizing the factors set forth in 20 C.F.R. § 404.1527. SSR 96-2p. Thus, even if a treating source's medical opinion is not entitled to controlling weight, the ALJ may find that the opinion should be adopted. SSR 96-2p. If an ALJ rejects the treating source's opinion, he must provide a sound explanation for that decision. 20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

In giving the opinions of Drs. Bedinghaus and Taylor "little weight," the ALJ stated simply that each of their respective treatment notes do not support their opinions. (Tr. 17.) In giving the opinion of Dr. Burgarino little weight, the ALJ found that his opinion was "inconsistent with the overall record and not supported by ongoing psychological examinations." (Tr. 18.)

The ALJ failed to articulate specifically what treatment notes he found inconsistent with the treating sources' ultimate conclusions. That lack of specificity fell

short of the sort of "good reasons" required under 20 C.F.R. § 404.1527(d)(2) and SSR 96-2p and resulted in the ALJ failing to build an "accurate and logical bridge" between the evidence and his conclusion. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). But more importantly, the ALJ applied an incorrect legal standard—at least with respect to Drs. Bedinghaus and Taylor. He disregarded their opinions because they were not consistent with their respective treatment notes. (Tr. 17.) But the ALJ's analysis is not limited solely to the treatment records of the treating source who offers an opinion; he must consider the record as a whole when deciding whether to give a treating source's opinion controlling weight. *See* 20 C.F.R. § 404.1527(d)(2). Only with respect to the conclusion of Dr. Burgarino did the ALJ articulate, albeit in conclusory fashion, the correct standard when he declared that his findings "are inconsistent with the overall record…." (Tr. 18.)

However, it is not appropriate to baldly state that any of these opinions are inconsistent with the overall record, especially when all of the opinions are markedly consistent with each other. All three treating sources concluded that Herron would suffer rates of absenteeism that would, in the view of the vocational expert (*see* Tr. 104-06), make her unemployable.

The most extensive treatment notes appear to be those of Dr. Taylor, who had an ongoing treatment relationship with Herron, providing regular individual therapy from March 22, 2011 (Tr. 811) until at least May 7, 2012 (Tr. 882). Dr. Taylor concluded that

Herron would be unable to consistently complete a normal eight-hour workday (Tr. 515) and would miss more than four days of work per month (Tr. 516).

Dr. Bedinghaus, Herron's primary care physician, reached similar conclusions. In her initial evaluation, dated April 26, 2011, she noted that Herron would have severe problems completing "a normal workday/week without interruptions from symptoms which cause an unreasonable number (more than three/day) and length of rest periods," and moderate problems maintaining "attention and concentration for at least two straight hours, a few times a day." (Tr. 511.) She also opined that Herron could sit, stand, and walk less than two hours in a normal workday. (Tr. 509.) When asked to review her conclusions, she stated on October 19, 2012 that her prior evaluation still reflected Herron's current condition. (Tr. 933-34.)

Consistent with these other professionals, Dr. Burgarino, a psychiatrist, stated that Herron would be tardy, would need to leave work early, or would be required to leave for two or more hours during a workday at least five times per month (Tr. 947); would need unscheduled breaks at least six times per day (Tr. 948); and would miss work at least four times per month. (*Id.*)

The ALJ's summary dismissal of these treating sources' conclusions and apparent application of an incorrect legal standard were mistakes of law that necessitate remand. On remand, the ALJ must evaluate the conclusions of the treating sources with the specificity demanded under 20 C.F.R. § 404.1527(c)(2) and SSR 96-2p. If the ALJ

concludes that there are good reasons to not afford one or all of the opinions controlling weight, he must apply the factors set forth in 20 C.F.R. § 404.1527(c) and articulate what weight he is affording each of the opinions. Even if a full analysis leads to the conclusion that each opinion is entitled to "little weight," the ALJ must be cautious to not equate that finding with "no weight." While each opinion alone might be entitled to little weight, several consistent opinions, considered together, might under appropriate circumstances add up to tip the balance against a single contrary opinion afforded great weight.

## C.    Limitations from All of Herron's Impairments

Herron contends that the ALJ's RFC assessment failed to include limitations from all of her impairments—specifically, limitations from her upper extremity pain, her bladder impairments, and her migraine headaches. (ECF No. 13 at 4.) She points out that, even if the ALJ's finding that these impairments were not severe is accepted, he still is required to consider any limitations and restrictions that the impairments imposed, citing SSR 96-8p.  And she contends that the ALJ erred by failing to take into account her variable functioning.

The ALJ's analysis wholly ignores Herron's upper extremity pain.  The record reflects that in April 2011, when asked whether Herron could perform fine finger movements constantly, frequently, occasionally, or less than occasionally, Dr. Bedinghaus opined "less than occasionally." (Tr. 937.) Over a year later, Dr. Bedinghaus

opined that Herron continued to have difficulties with handling, fingering, and manipulating. (Tr. 933-34.) The vocational expert who testified stated that "less than occasional" use of an employee's hands and fingers would preclude Herron from working at the jobs, which he identified she could otherwise perform. (Tr. 107.) And yet there is no indication that the ALJ factored any limitation regarding Herron's fine finger movements into his RFC assessment.

The Commissioner attempts to defend the ALJ's decision by noting that in his recitation of Herron's medical history he referred to a January 2011 EMG study that did not find neuropathy in Herron's right wrist. (ECF No. 18 at 8.) However, simply referring to facts in a summary of the record falls short of the analysis required of an ALJ. The Commissioner then notes that Herron testified that she had problems using her hands and fingers only three days a month. (ECF No. 18 at 8 (citing Tr. 93-94).) However, the Commissioner cannot offer a post hoc rationalization for the ALJ's decision relying upon reasoning the ALJ never offered.

By arguing that the ALJ could have offered reasons for disregarding Herron's upper extremity limitations instead of relying upon what the ALJ actually said, the Commissioner is implicitly conceding that the ALJ erred. The court concludes that, by failing to discuss Herron's upper extremity limitations, the ALJ committed an error of law. Even if not a severe impairment, the ALJ was required to discuss what, if any,

limitations these additional impairments posed upon Herron's ability to engage in substantial gainful activity. *See* SSR 96-08p.

The ALJ did discuss Herron's migraines and bladder problems and noted that these impairments were not severe. (Tr. 13.) With respect to the migraines, the ALJ concluded they were not severe because "treatment notes showed significant improvement following occipital nerve blocks." (*Id.*) As for Herron's bladder problems, the ALJ noted that Herron last received treatment for her bladder in October of 2011 and concluded that "there is no evidence that the condition continued or would cause more than minimal limitation." (*Id.*)

The court concludes that the ALJ's finding that Herron's migraines were not severe was insufficiently supported. The ALJ relied upon an isolated report coming just seven days after Herron underwent an occipital nerve block procedure. (Tr. 13.) The rest of the record suggests that any relief Herron enjoyed following that procedure was short-lived, with Herron noting in a journal, which she kept from roughly October through November of 2012, that she suffered headaches on thirty-four out of sixty-three days. (Tr. 288-91.) Without more, the fact that Herron enjoyed roughly a week of headache relief is not a sufficient reason for finding that Herron's migraine headaches were not a severe impairment. But even if her migraines could be appropriately characterized as a non-severe impairment, the ALJ was still required to consider any limitations or restrictions imposed by them in his assessment of her RFC. SSR 96-8p.

The ALJ committed the same errors with respect to his consideration of Herron's bladder impairments. He again relied upon an isolated fact in the record—specifically the fact that she last sought treatment for this impairment in October of 2011—and ignored contrary evidence, again a self-reported journal of symptoms (Tr. 940-41) that suggests that her impairment was severe. Similarly, even if her bladder impairment could be appropriately characterized as non-severe, it was again error for the ALJ to fail to consider it in his assessment of Herron's RFC. SSR 96-8p.

Finally, various treating sources concluded that Herron would miss work because of her impairments. Herron likewise reported having good days where she is able to perform basic chores and bad days where pain keeps her confined to a chair or a bed. (Tr. 254.) There is no indication that the ALJ considered Herron's variable functioning in his RFC assessment.

Remand is necessary to allow the ALJ to consider in his RFC assessment any limitations or restrictions imposed by Herron's upper extremity pain, migraine headaches, and bladder problems. In addition, reassessment of Herron's credibility and re-evaluation of the statements of medical sources that treated Herron may require a further reconsideration of Herron's RFC and may necessitate an assessment of Herron's variable functioning.

## CONCLUSION

In accordance with Sentence Four of 42 U.S.C. § 405(g), the court concludes that it is necessary to remand this matter for further proceedings. The ALJ's summary dismissal of the opinions of numerous medical professionals who treated Herron fell short of the specificity demanded under SSR 96-2p. The ALJ also failed to comply with SSR 96-7p in his assessment of Herron's credibility. The ALJ's conclusory statements lacked the specificity necessary to enable this court to adequately review his findings. These errors undermined the ALJ's RFC determination but, aside from these errors, the ALJ erred in assessing Herron's RFC by neglecting to consider certain additional limitations that the record tends to support.

**IT IS THEREFORE ORDERED** that this matter is remanded pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this order. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of November, 2014.

WILLIAM E. DUFFIN
U.S. Magistrate Judge